Frederick L. TERRY, Petitioner,

v.

Barbara BOCK, Respondent,

No. CIV. 01–CV–40372FL.

United States District Court,
E.D. Michigan,
Southern Division.

July 1, 2002.

Frederick Terry, Freeland, MI, Pro se.

Brenda E. Turner, Michigan Department of Attorney General, Habeas Corpus Division, Debra M. Gagliardi, Michigan Attorney General Office, Lansing, MI, for Respondent.

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

GADOLA, District Judge.

Frederick L. Terry, ("petitioner"), presently confined at the Saginaw Correctional Facility in Freeland, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed *pro se*, petitioner challenges his conviction on two counts of first-degree felony murder, M.C.L.A. 750.316; M.S.A. 28.548. For the reasons stated below, petitioner's application for writ of habeas corpus shall be denied.

### I. Background

Petitioner and co-defendant Eddie Coleman were charged with two counts of first-degree felony murder and one count of armed robbery, for an incident which took place in Garden City and Detroit, Michigan on January 1, 1997. Following a jury trial in the Wayne County Circuit Court, petitioner was found guilty as charged.

Prior to trial, petitioner moved to suppress two statements that he made to the police. An evidentiary hearing was conducted on his motion to suppress on March 28 and March 31, 1997. Officer Kenneth Williams of the Detroit Police Department testified that he was assigned to be the investigator of this case on January 2, 1997. Officer Williams learned that petitioner had been arrested at the scene of a fatal car accident and taken to Detroit Receiving Hospital. Petitioner was released from the hospital on the morning of January 2, 1997 and brought to police

headquarters. Officer Williams indicated that petitioner had some lacerations to his face but no major internal injuries. Officer Williams testified that his first contact with petitioner came at about eleven thirty in the morning in the interview room of his office. Officer Williams spoke with petitioner for about thirty seconds before petitioner told him that all that he had to say at that time was "Eddie Coleman", gave Williams an address, and stated that he was tired. Williams asked petitioner what the name Eddie Coleman meant, and petitioner replied that he was the driver. Williams testified that he had not begun interrogating petitioner at the time that this statement was made, because he first needed to process petitioner by doing a "print card" and an interrogation record. Williams claimed that petitioner had volunteered this information concerning Coleman. After making this statement, petitioner was conveyed back to the ninth floor of police headquarters. (Evidentiary Hearing Transcript, hereinafter "E.H.T.", 3/28/97, pp. 34–38).

Officer Williams spoke with petitioner again at four o'clock in the afternoon. Prior to speaking with petitioner, Officer Williams advised him of his constitutional rights. Officer Williams used a standard advice of rights form that the police department provided to its officers. Petitioner informed Williams that he had completed the tenth grade at Cody High School. Williams asked petitioner to read his constitutional rights out loud, which petitioner was able to do. Petitioner read and initialed every one of his constitutional rights on the rights form. Petitioner indicated to Williams that he understood every one of his constitutional rights. Detective Williams testified that petitioner had no difficulty reading the advice of rights form. Petitioner did not appear to be intoxicated or under the influence of any substance. Petitioner did not complain that he was tired or hungry. Petitioner informed Officer Williams that he had been arrested and interrogated before by police officers and was familiar with these types of proceedings. Petitioner signed the constitutional rights form at 4:20 p.m. (*Id.* at pp. 39–45). After completing the constitutional rights form and the interrogation record, Officer Williams again asked petitioner if he was tired, hungry, or under the influence of intoxicants. Petitioner indicated that he was not tired, hungry, or under the influence. Petitioner also stated that he was making the statement freely, voluntarily, without any threats or promises. Petitioner again admitted that he understood his constitutional rights. Petitioner then proceeded to make his statement to Officer Williams. Petitioner's statement was completed by 5:35 p.m. (*Id.* at pp. 45–49). Officer Williams acknowledged that petitioner had lacerations on his face and there may have been some injuries to his hands. Officer Williams testified, however, that petitioner did not complain that he was in pain or agony nor did he ask that the questioning stop. (*Id.* at p. 50). On cross-examination, Officer Williams acknowledged that petitioner had told him that he had been smoking "fifty ones", which is a combination of cocaine and tobacco, the day before the interrogation. (*Id.* at pp. 55–56).

Petitioner testified that he had been involved in an automobile accident on January 1, 1997 and that he received injuries as a result of the accident. After receiving medical treatment, petitioner was transported to police headquarters and questioned by Officer Williams. Petitioner testified that he asked Officer Williams for an attorney and told him that he was tired because he was up all night. Petitioner was escorted back to his cell, where he was able to get some sleep. However, petitioner was later awakened and taken back to a room on the ninth floor of police headquarters to be interviewed by Officer Williams.

At this point, Officer Williams told him that Eddie Coleman was putting everything on petitioner and showed him what was purportedly Coleman's statement. Petitioner could not actually read the statement, however, because his eyes were "red and puffy" and "were almost closed" as a result of his injury. (*Id.* at pp. 74–82).

Although Officer Williams asked petitioner if he wished to waive his rights, petitioner claimed that he did not understand what was meant by waiving his rights. Petitioner claimed that he made the statement to Williams because Officer Williams had told him that Eddie Coleman had made a statement against him and told petitioner that if he didn't cooperate, he would be sent to prison for the rest of his life. (*Id.* at pp. 90–92). Petitioner acknowledged that he had been questioned by police on a prior occasion for an unrelated criminal case in 1996 and had signed a waiver of rights form and given a statement in that case. (*Id.* at pp. 93–95).

The trial court ruled that petitioner had knowingly, intelligently, and voluntarily waived his constitutional rights. The court did not believe petitioner's testimony that he did not understand what it meant to waive one's rights, in light of the fact that he had this experience [of being interrogated by police] one year earlier. The court also observed that petitioner was not a juvenile but was a thirty one year old man who did not appear to have any emotional or mental problems. The court noted that in terms of education and intelligence, petitioner appeared to understand things "perfectly". The court also took into consideration petitioner's prior experience with the police. The court noted that there was no evidence that the questioning was prolonged. The trial court observed that when petitioner complained of being tired, he was returned to the ninth floor [where his cell was located]. The court further found that neither Officer Williams

nor petitioner complained that he could not continue with his interview because of his medical condition. Although acknowledging that petitioner had received injuries in the car accident, the court found that there was no evidence from the record that these injuries prevented petitioner from voluntarily making a statement. The court noted that there was no evidence that petitioner asked for medical attention, that he asked for food, or that he was deprived of any sleep. The trial court, in fact, observed that petitioner did not complain that he was tired at 4:20 p.m., when the second statement was made. Accordingly, the court ruled that petitioner's statements were admissible. (E.H.T.3/31/97, pp. 22–26).

At trial, Barbara Meixner testified that she was working at the 7–11 store in Garden City, Michigan on January 1, 1997, when a person approached the counter, informed her that he had a gun, and began striking the register with his hand. Meixner gave the man money because she believed he had a gun. Meixner observed the man get into a white car and drive towards Ford Road. (Trial Transcript, hereinafter "T"., 12/16/97, pp. 193–199).

Robert Shaw was using the money machine at the 7–11 store in Garden City on January 1, 1997 when an individual wished him a Happy New Year. As Shaw went to the store counter to make a purchase, Meixner informed him that she had just been robbed by the man who had wished Shaw a Happy New Year. Shaw looked out the door and observed this individual driving a white Ford Tempo which was occupied by another individual in the passenger seat towards Ford Road. Shaw followed the vehicle in his car before losing sight of it near Merriman Road. Shaw called the Garden City Police and gave them the license plate number and description of the vehicle. (*Id.* at pp. 220–225).

Officer Kenneth Boeth of the Redford Township Police Department received a radio broadcast to be on the lookout for a white Ford Tempo which had been involved in an armed robbery in Garden City, Michigan. Officer Boeth observed a vehicle which matched that description. When Boeth went to pull the vehicle over, the vehicle accelerated speed and began to violate traffic signals. As the vehicle approached eighty miles per hour and went through another red signal, Officer Boeth lost sight of the vehicle. As he approached the intersection, he observed the white Tempo in the middle of the intersection with severe damage to the front and passenger sides, and also noticed a badly damaged GEO vehicle. (*Id.* at pp. 231–232, 236–240, 242–245).

James Foster, a bus driver for the City of Detroit, testified that he was approaching the intersections of Evergreen and Joy Roads in Detroit, Michigan, when he observed a white car strike a red compact GEO as the white car drove at a high rate of speed. After the accident occurred, Foster observed two individuals get out of the white car and attempt to flee the scene. (*Id.* at pp. 256–261, 277–278).

Gordon Jones testified that he was good friends with petitioner and had known him for ten to twelve years. Jones testified that petitioner and Eddie Coleman were at his house on January 1st. Mr. Coleman began talking about "hitting a lick" and obtaining money. Petitioner was present when Coleman made this statement. After making these comments, petitioner and Coleman left Jones' house. (*Id.* at pp. 282–287). Jones saw Coleman the next day with bloody clothes. Jones acknowledged that he was closer to petitioner than to Coleman and didn't want to see anything bad happen to petitioner. (*Id.* at p. 290). Jones acknowledged that he had told Officer Williams that petitioner and Coleman had both discussed "hitting a lick" to obtain some money. Jones also acknowledged that he told Williams that "hitting a lick" meant committing a robbery. (*Id.* at pp 295–297) (T. 12/17/97, p. 23). Jones acknowledged that he was being truthful when he told Officer Williams that petitioner and Coleman discussed "hitting a lick". Jones further admitted that petitioner and Coleman asked Jones to accompany them, but he refused. (T. 12/17/97, pp. 24–26).

On cross-examination, Jones testified that petitioner appeared intoxicated to him at the time of these discussions. Jones further indicated that petitioner did not appear to participate in the discussions with Coleman concerning "hitting a lick". Jones claimed on cross-examination that he did not hear petitioner respond to Coleman's offer to commit a robbery. Jones further testified that petitioner had consumed a large amount of alcohol and narcotics prior to the incident. (*Id.* at 35–40).

Officer Melvin Smith of the Detroit Police Department testified that he heard about a car chase taking place over the radio on eastbound Joy Road approaching Evergreen Road. Officer Smith also received a description of the perpetrators and arrested petitioner, who had blood on his face and clothes. Petitioner was taken to the hospital, where doctors turned over glass particles which had been taken from the trauma room. (T. 12/17/97, pp. 6–11, 17).

Officer Kenneth Williams testified that he had petitioner transported to police headquarters from the hospital after ascertaining his condition from the hospital. Officer Williams initially met with petitioner to process him. As Williams was advising petitioner of his rights, petitioner "abruptly stopped" Williams and advised him to go to an address on Foyer Street in Detroit, Michigan to look for Eddie Coleman. Williams and other officers went to

that address and arrested Coleman and Gordon Jones. (*Id.* at pp. 61–66).

Officer Williams again interviewed petitioner later that same day. Prior to questioning petitioner, Officer Williams advised him of his constitutional rights. Although petitioner had lacerations on his face, he did not complain of being in pain, nor did he complain that he couldn't understand what Williams was saying. Petitioner did not complain that he was tired or hungry. (*Id.* at pp. 67–71). After agreeing to waive his constitutional rights, petitioner told Officer Williams that Eddie [Coleman] picked him up at about five o'clock p.m. on January 1, 1997. Petitioner indicated that he had been smoking a "fifty one". Coleman asked for a "hit" of the "fifty one". Petitioner told him not to "kill it" because he didn't have any more money. Coleman told him not to worry about it because he was going to get more money. Coleman drove out of Detroit to a 7–11 store. Coleman asked petitioner to "watch my ass". Coleman went into the store and came out a minute later with a bag of sardines and crackers and some money. The two men drove out of the lot. Petitioner asked Coleman if he got the money, to which Coleman replied "we were tight". After driving for awhile, petitioner observed a police cruiser behind them. Coleman began speeding. Petitioner told Coleman that he was driving too fast and asked him to stop to let him out. The car ultimately crashed and petitioner was arrested. Petitioner clarified that when Coleman told him to "watch his ass", that meant that Coleman was going to rob the store and that petitioner should look out for the police while he was doing it. Petitioner denied discussing the robbery with Coleman beforehand, but acknowledged that he acted as a look out for Coleman during the robbery. (*Id.* at pp. 75–78).

Prior to trial, the prosecution had sought to introduce evidence that petitioner and the co-defendant had previously been involved in an armed robbery which ended in a high-speed chase and a crash. Over defense counsel's objection, the court ruled that this evidence was admissible under M.R.E. 404(b) for the purpose of showing intent or knowledge. (Motion T., 5/16/97, pp. 8–19).

At trial, Freddie Waikow testified that on February 20, 1996, he was working at a gas station in Livonia, Michigan at about 10:35 p.m., when a customer informed him that two persons were staking out the place. After all of the customers left, Waikow was in the process of putting money into the safe when a black Ford Tempo drove up, an individual exited the car, and acted like he had a gun. Waikow gave money to the individual, who got back into the car and took off. (T. 12/17/97 at pp. 98–106).

Officer Gregory Perttunen of the Livonia Police Department received a radio run on February 20, 1996 about an armed robbery at a gas station on Schoolcraft and Merriman Roads in Livonia. Officer Perttunen received a description of a black Ford Tempo as the suspect vehicle. Officer Perttunen observed this vehicle traveling on eastbound I–96. After observing the plate number, Officer Perttunen was advised that the vehicle was reported stolen out of Detroit. When Officer Perttunen went to pull the vehicle over, the vehicle accelerated to one hundred miles per hour. The police chased the car for over three miles from I–96 to the Southfield Freeway. The suspect vehicle exited at Joy Road and ran the red light at Joy Road, nearly colliding with another vehicle. The black Ford Tempo ultimately crashed into a utility police and fire hydrant on Van Buren Street. Officer Perttunen chased the driver, who fled on foot, and ultimately arrested him. Perttunen identified petitioner as the driver whom he arrested. Officer

Perttunen's police cruiser had a video camera which was used to videotape police pursuits and which had been used to record this chase. The videotape of the high-speed chase involving petitioner was played for the jury. (*Id.* at pp. 109–127).

The parties stipulated that petitioner gave police a statement with respect to this 1996 incident, in which he admitted to driving the black Ford Tempo, but denied knowing that the passenger of the vehicle was going to hold up the store. Petitioner further admitted to being chased by officers. (*Id.* at pp. 128–131). There was no testimony offered at trial, however, which identified the passenger of this car as being co-defendant Eddie Coleman.

The medical examiner testified that he performed autopsies on the two decedents and determined that both individuals died from multiple internal injuries and that the manner of death was homicide. (*Id.* at pp. 146–149).

Petitioner was found guilty as charged. His first-degree felony murder convictions were upheld on appeal, although his armed robbery conviction was vacated on Double Jeopardy grounds. *People v. Terry,* 210718, 2000 WL 33521027 (Mich.Ct.App. March 28, 2000); *leave denied* 463 Mich. 934, 622 N.W.2d 64 (2000). Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

I. The trial court abused its discretion in admitting the Defendant's statement to the police since the confession was obtained from the Defendant without a knowing and voluntary waiver of his rights, thereby denying the Defendant due process pursuant to U.S. Const. Ams. V, XIV, and Mich. Const.1963, Art. 1, § 17.

II. The trial court committed reversible error in admitting irrelevant bad act evidence contrary to MRE 404(b), where the prosecutor failed to show that its probative value to a material issue outweighed its inherently prejudicial character,thereby denying Defendant due process under U.S. Const. Ams. V, XIV, and Mich. Const.1963, Art 1, § 17.

III. The trial court committed instructional error when it instructed the jury that intoxication was a defense to the armed robbery count without also instructing them that if they found that the specific intent necessary to commit armed robbery was absent due to intoxication, then the verdict must be not guilty of two counts of felony murder, thereby denying Defendant due process under U.S. Const. Ams. V, XIV, and Mich. Const.1963, Art 1, § 17.

IV. The evidence presented at trial was insufficient to convict the Defendant of armed robbery or either count of felony murder, thereby denying Defendant due process under U.S. Const. Ams. V, XIV, and Mich. Const.1963, Art 1, § 17.

## II. Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495.

## III. *DISCUSSION*

### A. Claim # 1. The *Miranda* claim.

Petitioner first claims that he did not knowingly, intelligently, and voluntarily waive his right against self-incrimination prior to making his statement to Officer Williams. Petitioner claims that his first statement to Officer Williams should have been suppressed, because it was made before petitioner had been given his *Miranda* warnings. Petitioner claims that the second statement to Officer Williams should have been suppressed because it was the direct product of his first statement. Petitioner also claims that Officer Williams intentionally coerced him into making a statement by informing him that Eddie Coleman had already made a statement against him.

■ A prosecutor may not use a defendant's statements which stem from custodial interrogation unless the prosecutor can demonstrate the use of procedural safeguards which are effective to secure a defendant's privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Unless other means are devised to inform a suspect of his right to silence and a "continuous opportunity to exercise it", the following warnings are required to be given to a suspect:

1. the person must be warned that he has a right to remain silent;

2. that any statement he does make may be used against him;

3. and that he has a right to the presence of an attorney, either appointed or retained.

*Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

With respect to petitioner's first statement, the Michigan Court of Appeals found that this statement had been volunteered and was not the result of custodial interrogation. Accordingly, *Miranda* warnings were not required and no Fifth Amendment violation occurred. *People v. Terry*, Slip. Op. at * 1. With respect to petitioner's second statement, the Michigan Court of Appeals rejected petitioner's argument that this second statement was "tainted" by the first statement, because the first statement had been voluntarily made by petitioner. The Michigan Court of Appeals further found that the mere fact that Officer Williams informed petitioner that Eddie Coleman had made a statement placing the blame upon petitioner, whether true or false, was insufficient to render petitioner's statement involuntary. The Michigan Court of Appeals noted that petitioner was read his *Miranda* warnings prior to giving his second statement. The Michigan Court of Appeals further observed that petitioner had previous experience with interrogations and could comprehend the meaning of waiving his rights. While petitioner suffered superficial injuries, there was no indication that he was otherwise injured, intoxicated,

or drugged. The Michigan Court of Appeals further noted that petitioner did not claim that he was deprived of food and was given a chance to sleep. Under the totality of circumstances, the Michigan Court of Appeals concluded that petitioner's waiver of his rights was knowing, voluntary, and intelligent. *Id.* at *2.

■ If fairly supported by the record, state court findings on subsidiary questions, such as the length and circumstances of the interrogation, and the defendant's prior experience with *Miranda* warnings, are conclusive on a federal habeas court that is asked to decide whether the confession was voluntary. *Muniz v. Johnson,* 132 F.3d 214, 219 (5th Cir.1998) (citing *Miller v. Fenton,* 474 U.S. 104, 117, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). Whether a defendant understood his or her *Miranda* rights is also a question of fact underlying the question of whether his waiver of those rights was knowing and intelligent. Thus, on federal habeas review, a federal court has to presume that the state court's factual finding that a defendant fully understood what was being said and asked of him was correct unless the petitioner shows otherwise by clear and convincing evidence. *Valdez v. Ward,* 219 F.3d 1222, 1231 (10th Cir.2000).

■ The Michigan Court of Appeals found that petitioner's first statement was admissible because it was a voluntary statement which was not made in response to custodial interrogation. The special procedural safeguards outlined in *Miranda* are required not merely when a suspect is taken into custody, but instead where a suspect in custody is subjected to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). " 'Interrogation', as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id. Miranda* warnings are required whenever a

person in custody is subject either to express questioning or its "functional equivalent". *Rhode Island v. Innis,* 446 U.S. at 300–301, 100 S.Ct. 1682.

■ In the present case, the Michigan Court of Appeals determined that petitioner's statement to the police was voluntary and not made in response to any interrogation by Officer Williams. A state court's finding that no express interrogation of a habeas petitioner occurred is a factual finding which is entitled to the presumption of correctness. *Dell v. Straub,* 194 F.Supp.2d 629, 646 (E.D.Mich.2002). Petitioner has offered no evidence to rebut the Michigan Court of Appeals' finding that petitioner's first statement was not the result of custodial interrogation, but was voluntarily made. This Court must accept this finding as true for habeas purposes.

Where a defendant makes a voluntary statement without being questioned or pressured by the police, the statements are admissible despite the absence of *Miranda* warnings. *United States v. Murphy,* 107 F.3d 1199, 1204 (6th Cir.1997) (internal citations omitted). "[I]t is well settled that a volunteered statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *United States v. Thornton,* 17 F.Supp.2d 686, 693 (E.D.Mich.1998).

In the present case, the Michigan Court of Appeals determined that petitioner's first statement to Officer Williams was admissible in spite of the absence of *Miranda* warnings, because the statement was voluntarily made by petitioner and was not the result of custodial interrogation. The Michigan Court of Appeals' decision was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable

determination of the facts that were presented on the record.

■ Petitioner claims his second statement should have been suppressed because it was tainted by the first statement obtained by Officer Williams in violation of *Miranda.* However, as the Michigan Court of Appeals pointed out, petitioner volunteered the first statement to Officer Williams, therefore, there was no coercive police activity which could taint the second statement. Moreover, "[I]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Therefore, although *Miranda* requires that any unwarned statements or confessions must be suppressed, the admissibility of any subsequent statement or confession should turn solely on whether it is knowingly and voluntarily made. *Id.*

■ In determining whether a suspect has validly waived his *Miranda* rights, a trial court should consider the following factors: first, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception and, second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it, and only if the totality of the circumstances surrounding the investigation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Machacek v. Hofbauer,* 213 F.3d 947, 954

(6th Cir.2000) (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

■ Petitioner's main contention is that his second statement was made under duress after Officer Williams showed him a statement that had purportedly been made by Eddie Coleman and told petitioner that Coleman had placed all of the blame on him. As an initial matter, petitioner does not clearly allege that Officer Williams falsely claimed that Eddie Coleman had implicated petitioner in the crime. Nonetheless, the U.S. Supreme Court has held that the fact that the police falsely told a defendant during his interrogation that his companion had confessed, although relevant, was insufficient to make the defendant's otherwise voluntary confession involuntary. *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). The principle in *Frazier* has been extended to cases where a defendant claims that the waiver of his *Miranda* rights was involuntary, because the police falsely told him that his co-defendant had implicated him. *See United States v. Velasquez,* 885 F.2d 1076, 1088–1089 (3rd Cir.1989)(defendant's waiver of previously invoked *Miranda* rights voluntary, notwithstanding DEA agent's false statement to her that her co-defendant had made a statement against her and was set free); *United States v. Colima–Monge,* 962 F.Supp. 1323, 1332 (D.Or.1997) (defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, even though police used interview technique of lying to the defendant about admissions supposedly made by the defendant's accomplice concerning the defendant's involvement).

In the present case, there is no evidence that Officer Williams falsely represented to petitioner that Coleman had implicated him in this offense. However, even if Officer Williams misrepresented to petitioner that Coleman had made a statement

against petitioner, this in and of itself would be insufficient to render petitioner's waiver of his *Miranda* rights involuntary.

In the present case, the Michigan Court of Appeals' determination that petitioner knowingly, voluntarily, and intelligently waived his *Miranda* rights prior to making his second statement was not unreasonable. As the Michigan Court of Appeals indicated, petitioner was advised of his *Miranda* rights prior to making this statement. Petitioner admitted that he had prior experience with police interrogations and could therefore comprehend what it meant to waive his constitutional rights. While petitioner had received some lacerations to his face, he did not complain of being in pain. *See, e.g., United States v. Granados,* 846 F.Supp. 921, 926 (D.Kan. 1994) (rejecting defendant's claim that his statement was involuntary because he was in pain from cuts to head and hand received during an automobile accident, where defendant told the police that he understood his *Miranda* rights, gave rational, coherent, and responsive answers, and never complained that the pain was so great as to prevent him from answering the officer's questions).

Petitioner has therefore failed to show that he was incapable of knowingly and intelligently waiving his *Miranda* rights or that the state court's decision was contrary to, or an unreasonable application of clearly established federal law. The state court's determination that petitioner's waiver of his *Miranda* rights was knowingly and intelligently made was not based upon an unreasonable determination of the facts, and thus, federal habeas relief is not warranted. Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2. The prior bad acts evidence claim.**

Petitioner next contends that the trial court erred in allowing the prosecutor to use his involvement in a 1996 armed robbery as prior bad acts evidence. The Michigan Court of Appeals rejected this claim, finding that evidence that petitioner had previously been involved in an armed robbery and high-speed chase with his co-defendant was relevant as to his intent and knowledge. *People v. Terry,* Slip. Op. at * 2–3.

■ Habeas review does not encompass state court rulings on the admission of evidence unless there is a federal constitutional violation. *Clemmons v. Sowders,* 34 F.3d 352, 357 (6th Cir.1994); *Fuson v. Jago,* 773 F.2d 55, 59 (6th Cir.1985). Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case so as to deny the defendant the fundamental right to a fair trial. *Welch v. Burke,* 49 F.Supp.2d 992, 1000 (E.D.Mich.1999).

■ A federal habeas court will not disturb a state court's admission of evidence of prior crimes, wrongs, or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that admitting the evidence denies the petitioner due process of law. *Hopkinson v. Shillinger,* 866 F.2d 1185, 1197 (10th Cir.1989); *Cosme v. Elo,* 2000 WL 246592, * 3 (E.D.Mich. February 4, 2000). The inquiry in reviewing a claim of improper admission of other acts evidence is whether the evidence was rationally connected to the crime charged. *See Carter v. Jago,* 637 F.2d 449, 457 (6th Cir.1980); *Dell v. Straub,* 194 F.Supp.2d at 645. As the Seventh Circuit has indicated: "[S]omething more than a garden-variety violation of the standard of 404(b) must be shown to cross the constitutional threshold." *Watkins v. Meloy,* 95 F.3d 4, 7 (7th Cir.1996).

■ In the present case, evidence that petitioner had previously participated in an armed robbery which involved a high-speed chase in an attempt to elude the police was rationally connected to the instant offense, because it was relevant on the issue of petitioner's intent and knowledge. To convict a defendant of felony murder in Michigan, the prosecution must prove that the defendant acted either with an intent to kill, an intent to do great bodily harm, or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm. *Grant v. Rivers,* 920 F.Supp. 769, 784 (E.D.Mich.1996)(citing *People v. Aaron,* 409 Mich. 672, 733, 299 N.W.2d 304 (1980)). In this case, evidence that petitioner had previously participated in an armed robbery and a high-speed chase was relevant to show that petitioner was aware of the possibility that the co-defendant might lead the police on a high-speed chase to avoid capture. Such evidence could also have permitted a jury to infer that petitioner, in spite of his statement to the police, encouraged the co-defendant to elude the police, in light of his own prior act of attempting to elude the police to avoid capture after being involved in an armed robbery. Petitioner is therefore not entitled to habeas relief on his second claim.

### C. Claim # 3. The jury instruction claim.

Petitioner next contends that the trial court erred in failing to instruct the jury that if it found that the specific intent necessary to commit the underlying armed robbery count was absent due to intoxication, then the jury had to acquit petitioner of the felony murder counts. The Michigan Court of Appeals ruled that petitioner had failed to preserve the issue for appeal, because he failed to request a specific instruction and failed to object to the trial court's failure to give the instruction. The Michigan Court of Appeals further indicated that their failure to consider the issue would not result in manifest injustice. *People v. Terry,* Slip. Op. at *3. Respondent contends that this issue is procedurally defaulted.

■ When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice". *Coleman v. Thompson,* 501 U.S. 722, 750–751, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier,* 477 U.S. 478, 479–480, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986). However, to be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

■ In this case, the Michigan Court of Appeals clearly indicated that by failing to object at trial, petitioner had not preserved his jury instruction claim. The Michigan Court of Appeals' limited review of the unobjected to error for manifest injustice does not constitute a waiver of the procedural default by the State of Michigan. *Paprocki v. Foltz,* 869 F.2d

281, 285 (6th Cir.1989); *Millender v. Adams,* 187 F.Supp.2d 852, 878 (E.D.Mich. 2002).

In the present case, petitioner has not offered any reasons to excuse the default. Petitioner has therefore failed to establish cause to excuse his default. Moreover, even assuming that petitioner has established cause for his default, he is unable to satisfy the prejudice prong of the exception to the procedural default rule because his claim is without merit. The cause and prejudice exception is conjunctive, requiring proof of both cause and prejudice. *Cosme v. Elo,* 2000 WL 246592, *3 (E.D.Mich.2000) (citing *Klein v. Neal,* 45 F.3d 1395, 1400 (10th Cir.1995)). Because petitioner's claim is without merit, he has failed to establish the prejudice prong to excuse his default. *Id.* Additionally, petitioner has not presented any new reliable evidence to support any assertion of innocence which would allow this Court to consider his claim as grounds for a writ of habeas corpus in spite of the procedural default. Petitioner's claim is procedurally defaulted. A brief review of the claim also shows that it is without merit.

In the present case, the trial court instructed the jury about the defense of intoxication, as it pertains to the count of armed robbery. (T. 12/18/97, pp. 61–62). However, petitioner contends that the trial court erred in failing to instruct the jury that if they found that petitioner was so intoxicated that he could not form the intent to commit the armed robbery, then the jury had to find him not guilty of the felony murder counts.

 The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned", and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbe,* 431 U.S. 145, 154–155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Williams v. Abshire,* 544 F.Supp. 315, 319 (E.D.Mich.1982). To warrant habeas relief, the jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Scott v. Mitchell,* 209 F.3d 854, 882 (6th Cir.2000). The challenged instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial court record. *Grant v. Rivers,* 920 F.Supp. at 784. A habeas petitioner's burden of showing prejudice is especially heavy when a petitioner claims that a jury instruction was incomplete, because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. *Hardaway v. Withrow,* 147 F.Supp.2d 697, 707 (E.D.Mich.2001).

In the present case, the trial court instructed the jury that if petitioner was so intoxicated that he could not form the intent to commit the armed robbery, then the jury would have to find him not guilty of armed robbery. The trial court further instructed the jury that one of the elements of first-degree felony murder was that the murder occurred while petitioner was committing, attempting to commit, or helping someone else commit the crime of robbery. The court also instructed the jury on the elements of armed robbery and the lesser offense of unarmed robbery, including the element of specific intent. (*Id.* at pp. 65–70). Obviously, the jury was instructed that in order to find petitioner guilty of felony murder, they would have to find that he had committed an underly-

ing felony, either armed or unarmed robbery. The jury was also instructed that if petitioner was so intoxicated that he could not form the specific intent required for robbery, then the jury should acquit him of that charge. When viewed in their entirety, the jury instructions adequately informed the jury that if petitioner was too intoxicated to commit the armed robbery in this case, he should be found not guilty of first-degree felony murder. Petitioner's third claim is procedurally defaulted and without merit.

### D. Claim # 4. The sufficiency of evidence claim.

Petitioner lastly claims that there was insufficient evidence to convict him of first-degree felony murder and the underlying count of armed robbery. In rejecting this claim, the Michigan Court of Appeals found that there was sufficient evidence to show that petitioner aided and abetted in the armed robbery, in light of his statement that he was acting as lookout for Coleman. The Michigan Court of Appeals also concluded that there was sufficient evidence to find petitioner guilty of first-degree felony murder, finding that petitioner showed a wanton and wilful disregard for the natural consequences which arose from the high-speed chase. Although petitioner had told the police that he had no idea that co-defendant Coleman would try to flee from the police and claimed that he encouraged him to slow down, the Michigan Court of Appeals believed that the prior robbery that petitioner had committed with Coleman in 1996 showed otherwise. The Michigan Court of Appeals concluded that this prior robbery showed that petitioner's "intent may not have been so innocent" and that he may have actually encouraged his co-defendant to attempt to elude the police. The Michigan Court of Appeals also believed that this prior robbery demonstrated petition-

er's knowledge of a possible chase. *People v. Terry*, Slip. Op. at * 4.

A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Scott v. Mitchell*, 209 F.3d at 885 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Matthews v. Abramajtys*, 92 F.Supp.2d 615, 632 (E.D.Mich.2000). The scope of review for a collateral review to the sufficiency of evidence in a state prosecution is extremely limited and a habeas court must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state and defer to that resolution. *Sexton v. Kemna*, 278 F.3d 808, 814 (8th Cir.2002) (internal quotation omitted).

The elements of first-degree felony murder are: (1) the killing of a human being; (2) with an intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm is the probable result (i.e., malice); (3) while committing, attempting to commit, or assisting in the commission of one of the felonies enumerated in the felony murder statute. *People v. Carines*, 460 Mich. 750, 759, 597 N.W.2d 130 (1999). The facts and circumstances surrounding a killing can give rise to an inference of malice. A jury can infer malice from evidence that a defendant intentionally set into motion a force likely to cause death or great bodily harm. *Id.* To convict a defendant of felony murder in Michigan, the prosecution must

prove that the defendant acted either with an intent to kill, an intent to do great bodily harm, or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm. *Grant v. Rivers,* 920 F.Supp. at 784. Murder committed while attempting to escape from the scene of a felony is felony murder if it is immediately connected with the underlying felony. *People v. Jones,* 66 Mich.App. 223, 236, 238 N.W.2d 813 (1975).

██ As a preliminary matter, there was sufficient evidence for a rational trier of fact to conclude that petitioner aided and abetted in an armed robbery, in light of his statement to Officer Williams that he acted as a lookout for Coleman. More importantly, in the present case, there was sufficient evidence for a rational trier of fact to conclude that petitioner had the requisite malice to find him guilty of felony murder. A rational trier of fact could infer petitioner's intent or knowledge to commit the felony murders based upon his involvement in the 1996 armed robbery, in which he drove a car and led police on a high-speed chase after the gas station was robbed. A rational trier of fact could infer from this prior incident that when petitioner and Coleman drove to the gas station in Garden City in 1997, they planned on using their car to escape from the police. Petitioner admitted to Officer Williams that he acted as a lookout for the police while Coleman went inside the gas station to rob it. Based upon petitioner's prior involvement in an armed robbery of a gas station, in which he actually drove the car in an attempt to elude police, a jury could properly infer that petitioner, in his role as lookout, encouraged Coleman to attempt to flee and elude the police. At a minimum, a rational trier of fact could infer that by participating in an armed robbery of a gas station by using a motor vehicle, petitioner knew the possibility that his co-defendant might attempt to flee and elude the police

with this car, just as petitioner had done a year earlier. Finally, because petitioner had crashed the vehicle that he had been driving during the 1996 robbery, petitioner was aware of the risks that a high-speed chase could create. Therefore, in light of petitioner's prior involvement in an armed robbery which ended in a high-speed chase and collision, it was not unreasonable for a rational trier of fact to reject petitioner's story that he encouraged the co-defendant to slow down after the police went to stop their vehicle, nor was it unreasonable for the Michigan Court of Appeals to conclude that there was sufficient evidence of malice in this case.

In the present case, the state court's determination that the prosecutor presented sufficient evidence to establish the element of malice in petitioner's murder prosecution was not clearly erroneous, so as to warrant habeas relief. *See Williams v. White,* 183 F.Supp.2d 969, 975 (E.D.Mich. 2002). Accordingly, petitioner is not entitled to habeas relief on his final claim.

## IV. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

## *JUDGMENT*

The above entitled matter having come before the Court on a Petition for Writ of Habeas Corpus, Honorable Paul V. Gadola, a United States District Judge, presiding, and in accordance with the Memorandum Opinion and Order entered on July 1st, 2002.

IT IS ORDERED AND ADJUDGED that the Petition for Writ of Habeas Corpus is DISMISSED.